**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John FOX, Defendant–Appellant.**

**No. 88–2007.**

United States Court of Appeals,
Tenth Circuit.

May 9, 1990.

Rehearing Denied June 13, 1990.

David M. Conner, Asst. U.S. Atty., Denver, Colo. (Michael J. Norton, U.S. Atty. and James K. Bredar, Asst. U.S. Atty.,

Denver, Colo., were also on the brief), for plaintiff-appellee.

Mark J. Rosenblum, Asst. Federal Public Defender, Denver, Colo. (Michael G. Katz, Federal Public Defender, Denver, Colo., was also on the brief), for defendant-appellant.

Before HOLLOWAY, Chief Judge, GARTH[*] and McKAY, Circuit Judges.

HOLLOWAY, Chief Judge.

Defendant-appellant John Fox (Fox) appeals his conviction of conspiracy to possess with intent to distribute and to distribute cocaine, in violation of 21 U.S.C. § 846 (Count I), and of interstate travel for the purpose of promoting unlawful activity, in violation of the Travel Act, 18 U.S.C. § 1952 (Count VI). On appeal, Fox asserts that: (1) the district court erred by denying his motion to suppress evidence seized at his arrest; (2) the evidence is insufficient to support his conspiracy conviction; (3) the district court erred in refusing to give Fox's tendered jury instruction concerning the difference between a conspiracy and a buyer-seller relationship; and, (4) the government failed to prove a "business enterprise" within the meaning of the Travel Act.

## I. *Factual Background*

Viewing the evidence in the light most favorable to the jury's verdict, *United States v. Kendall,* 766 F.2d 1426, 1429 (10th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986), the record shows these facts:

In August 1987 Irene Jassick informed agents of the United States Drug Enforcement Administration (DEA) that certain associates of hers were engaged in the distribution of cocaine in the Denver area. (R. IV, at 35–37.) Jassick agreed to cooperate with DEA agents and was registered as a DEA informant. Over the course of the next three and a half months, with Jassick's assistance, DEA agents conducted an investigation into alleged cocaine distribution by John Moresco and John Dente, Fox's co-defendants. Jassick purchased cocaine from Moresco and Dente on three occasions while under the supervision of DEA agents. (*Id.* at 38.) Those drug sales were the basis of three substantive counts against Moresco and Dente.

Sometime during October 1987, DEA agents asked Jassick to determine whether Moresco and Dente were interested in purchasing a large quantity of cocaine from a supposed acquaintance of hers, who would in fact be a DEA agent. (*Id.* at 40–41.) Moresco reportedly was interested in making such a purchase, and agreed to meet Jassick's acquaintance. Eventually, Jassick set up a meeting between the two men.

On November 25, 1987, Moresco, Jassick, and DEA undercover agent Robert Castillo met at a Denny's Restaurant in Denver. (R. V, at 52.) Castillo was working in an undercover capacity, posing as a Mexican national interested in selling cocaine. Jassick was wearing a radio transmitter which was monitored by DEA agents Musso and Topper in a car parked at a motel adjacent to the restaurant. (*Id.* at 53.) The agents had a recording device in their car, but because of background noise and equipment failure, they were unable successfully to record the conversation. (*Id.* at 155–56.)

Castillo is fluent in Spanish and he and Moresco conducted the first part of their meeting in Spanish. (*Id.* at 86.) Moresco told Castillo that he and his associate were interested in purchasing two kilograms of cocaine, and that they had approximately $16,000 available to purchase one kilogram immediately. (*Id.*) Moresco then indicated that he worked with an associate with whom he divided sales territory, and that their present source of supply was an individual in Los Angeles. (*Id.* at 87.) Castillo then offered to sell Moresco two kilograms of cocaine. (*Id.* at 88.) At that point, the defendant-appellant, John Fox, entered the

---

[*] The Honorable Leonard I. Garth, United States Circuit Judge for the Third Circuit, sitting by designation.

restaurant and joined the conversation.[1] (*Id.*)

Agent Castillo testified that Moresco introduced Fox, while Fox was sitting there right in front of Castillo, as "his associate who was responsible for the southern part of Denver in the coke traffic." Fox took no exception to this statement. (*Id.* at 88.) After Castillo informed Fox of his earlier offer to Moresco, the following exchange occurred, according to Castillo:

Q Then what happened?

A Well, then Mr. Fox also advised me they had present $16,000 for one kilo of cocaine. I then advised him to purchase a couple. We then agreed we would wait a couple of weeks.

(*Id.* at 89). Fox then advised Castillo about a beeper system, a "system they would use, him and Mr. Moresco, to communicate with each other."[2] (*Id.*) Agent Musso testified that Fox left the restaurant in the company of Moresco and that they engaged in a brief conversation before departing separately. (*Id.* at 55.)

On November 30 Moresco telephoned agent Castillo and told him that he and Fox could not make the purchase as planned, saying they had been robbed of $25,000 that they had accumulated to purchase the cocaine. (*Id.* at 137–38.) Moresco indicated that he had only $8,000 left, which he would use for smaller cocaine purchases from someone else. (*Id.* at 92.) Castillo testified that Moresco said he needed a week or two to raise the funds necessary to proceed with the transaction. (*Id.*) Moresco testified, however, that he had lied about the theft, and that neither Moresco nor Fox ever intended to do business with Castillo because they suspected he was an undercover agent, and because they didn't have enough money to purchase two kilograms of cocaine.[3]

Prior to the November 25 meeting, the DEA agents were unaware of Fox's association with Moresco; their investigation had focused exclusively on Moresco and Dente. (*Id.* at 82–95; 161–62.) Moresco testified, however, that during the three months prior to the November 25 meeting at the Denny's restaurant, he and Fox met on two or three occasions to sell each other small quantities of cocaine. (*Id.* at 118–19.) The two men executed these drug transactions, typically involving no more than half an

---

1. Agents Musso and Topper observed Fox enter the restaurant, but from their vantage point they could not see whether he attended the meeting. (*Id.* at 54.) Agent Topper later testified that they had never seen Fox before. (*Id.* at 161–62.) The agents subsequently identified Fox through his license plate number. (*Id.* at 56–57.)

2. Agent Castillo testified as follows:

Mr. Fox had suggested that before they made any purchases, that he would first like to see the package, meaning the two kilos of cocaine, and would like to take a sample of that package, and I said that would be no problem at all.

However, I would then want, before the packages were observed by Mr. Fox, I would like to see the money.

It was then agreed that we would then meet at a pre-arranged location when the transaction was to occur. I would then introduce a second undercover agent as my cousin who I identified as only David.

He would then go with Mr. Fox to another location, supposedly where the packages would be. I would stay with Mr. Moresco at a location where he had already showed me the money.

Supposedly at that point Mr. Fox would be allowed to see the package, allegedly see a sample in which he would notify Mr. Moresco through a beeper system.

At that time I was supposed to deliver the money—excuse me—I was supposed to receive the money from Mr. Moreseco and in turn Mr. Fox was supposed to receive the packages from the individual identified as David.

(R. V at 89–90.)

3. Moresco testified as follows:

We agreed to sit and listen to this fellow knowing full well that there was something wrong there, and we had no intention of ever doing anything with him....

Q: Well, you had the meeting, though, right?

A: Yes.

Q: And then the meeting broke up and isn't it the case that Mr. Fox contacted you and told you he didn't want to have anything to do with this Roberto [agent Castillo], and he didn't want to go into the transaction?

A: That's totally correct, and I think that he didn't have to tell me that. We already knew that. We went there not to do any business with him in the first place. We just went there to see what he had to say.

(R. V at 138.)

ounce of cocaine, to ensure that they each had a sufficient supply of cocaine to meet the needs of their customers. (*Id.* at 119.) Moresco also testified that Fox accompanied him to Las Vegas on two occasions prior to December 1, 1987, to gamble and to purchase cocaine from their supplier, Steve Boubon. (*Id.* at 121–24; 132.) He and Fox pooled their money so that he could purchase a larger quantity of cocaine. (*Id.* at 121–24.) Fox never had any direct contact with Boubon, however, and did not receive his share of the cocaine from Moresco until they had returned to Denver. *Id.*

On December 1, 1987, DEA agents followed John Dente to Las Vegas, Nevada, expecting him to purchase a significant quantity of cocaine. Agent Musso had met with Dente in Denver, in an undercover capacity, and arranged to accompany him to Las Vegas to purchase twelve ounces of cocaine from Steve Boubon. (*Id.* at 57–59.) The sale took place as planned, in the Riviera casino, and agents promply arrested Dente and Boubon. (*Id.* at 63–64.) A consensual search of Boubon's room revealed approximately one and one-half kilograms of cocaine. (*Id.* at 64.)

Before Musso left Denver, Jassick had informed him that Moresco was also planning to purchase cocaine from the same supplier, Steve Boubon. (*Id.* at 57–59.) Therefore, after discovering the cocaine in Boubon's room, the DEA agents suspected that Boubon had expected to meet at least one other customer in Las Vegas, possibly Moresco. Shortly thereafter, agents located Moresco's truck in the parking lot next to the casino, and saw Fox playing the slot machines inside the casino near the "Sportsbook" where they had just arrested Boubon. (*Id.* at 67.) After several hours of surveillance, Fox and Moresco were arrested in the hotel parking lot. (*Id.* at 71–72.) A search revealed that Fox was carrying approximately $19,600 in cash. (*Id.* at 72.)[4] Moresco later testified that although he did not have specific plans to purchase cocaine on this particular trip, he

was planning to introduce Fox to Steve Boubon, and Boubon had previously agreed to the introduction. (*Id.* at 127–28; 141–42.) He further testified that the purpose of the planned introduction was to permit Fox to do business directly with Boubon in the future. (*Id.* at 141–42.)

Fox was charged in two counts of a six-count Indictment. His co-defendants, Moresco and Dente, were named in the same two counts and, in addition, were charged with four substantive drug-related offenses in the remaining counts. After pleading guilty to two charges, but prior to sentencing, Moresco agreed to testify against Fox in return for immunity from further prosecution and in the hope of a lighter sentence. (*Id.* at 136.) The record does not reflect Dente's fate. Fox was convicted of both counts after a jury trial, and sentenced to seven years on Count I (conspiracy), 21 months on Count VI (the Travel Act violation), and following these concurrent terms, three years' supervised release. This appeal followed.

## II. *The Motion to Suppress*

Fox first argues that the district court erred by denying his motion to suppress the evidence (the money) seized at his warrantless arrest because the arresting officers lacked probable cause. We disagree.

Fox does not challenge the officers' authority to conduct a warrantless search of his person incident to a lawful arrest, *see New York v. Belton*, 453 U.S. 454, 461, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981); *Michigan v. DeFillippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979), or their authority to seize evidence of a crime discovered by such a search. Thus, the admissibility of the evidence derived from Fox's arrest depends solely on the lawfulness of the arrest.

The warrantless arrest here was valid only if at the time of the arrest the agents had probable cause. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d

---

**4.** Testimony at the suppression hearing indicates that Fox was carrying $19,100 in cash. (R.

II at 12.)

142 (1964). Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Id.* Probable cause must be judged in light of the "totality of the circumstances" at the time of the arrest. *United States v. Watson,* 423 U.S. 411, 428, 96 S.Ct. 820, 830, 46 L.Ed.2d 598 (1976). "The amount and quality of information necessary for probable cause to make a warrantless arrest is neither greater nor less than that needed for a magistrate to validly issue a warrant, but is significantly less than what is necessary to prove an accused's guilt." *United States v. Swingler,* 758 F.2d 477, 486 (10th Cir.1985) (citations omitted).

 Because the determination that probable cause exists is a predominantly factual analysis, we will not disturb the trial court's finding of probable cause unless, viewing all the evidence presented at trial in the light most favorable to the government, the court's finding is clearly erroneous. *United States v. Freeman,* 816 F.2d 558, 561 (10th Cir.1987); *United States v. Alonso,* 790 F.2d 1489, 1496 (10th Cir.1986); *United States v. Gagnon,* 635 F.2d 766, 769 (10th Cir.1980), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981). Here we hold that there was no error in the trial court's finding of probable cause.

The district court found that the federal drug agents who arrested Fox in Las Vegas had probable cause to believe that he had conspired to engage in criminal activity, namely possession with intent to distribute and to distribute cocaine. (R. II at 42–43.) The court relied on the following facts known to the arresting officers: (1) Fox's participation in the November 25 meeting at the Denny's Restaurant in Denver; (2) Moresco's introduction of Fox as the partner "of one of the individuals involved in the transaction," and that "his

assignment was the south part of Denver"; (3) the availability of Fox's $16,000 for the purchase of cocaine; and, (4) the discussion of Las Vegas as the place of physical transfer where Moresco would generally receive cocaine from his Los Angeles transactions. (*Id.*) We are persuaded that the totality of these circumstances, viewed in the light most favorable to the government, supports the district court's finding that the agents had probable cause to arrest Fox, and therefore that the search incident to that arrest was lawful.

### III. *Sufficiency of the Evidence*

Fox next challenges the sufficiency of the evidence to prove that he knowingly and willfully joined in a conspiracy to possess with the intent to distribute and to distribute cocaine.[5] Fox maintains that the evidence, at most, shows that he was involved in a series of separate and distinct transactions, not a single conspiracy with a common objective.

 We review the entire record in the light most favorable to the government to determine whether the evidence, both direct and circumstantial, together with the reasonable inferences to be drawn therefrom, is such that a reasonable jury could find the defendant guilty beyond a reasonable doubt. *United States v. Gomez,* 810 F.2d 947, 959 (10th Cir.), *cert. denied,* 482 U.S. 908, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987); *United States v. Hooks,* 780 F.2d 1526, 1529–31 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). In a conspiracy trial, however, "caution must be taken that the conviction not be obtained 'by piling inference upon inference.'" *United States v. Butler,* 494 F.2d 1246, 1252 (10th Cir.1974) (quoting *Direct Sales Co. v. United States,* 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943)). "The evidence, when viewed in its entirety, must generate more than a mere suspicion of guilt, and where such evidence is equally consistent with both guilt and

---

5. The district court denied Fox's motion for a judgment of acquittal as to Count I, the conspir- acy count, at the close of the government's case.

innocence the conviction cannot be sustained." *Id.*

The evidence in a conspiracy prosecution must show that two or more persons agreed to violate the law, that the defendant knew at least the essential objectives of the conspiracy, and that the defendant knowingly and voluntarily became a part of it. *United States v. Savaiano,* 843 F.2d 1280, 1294 (10th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 99, 102 L.Ed.2d 74 (1988). To establish Fox's membership in the conspiracy, the government must sufficiently prove that he had a "unity of purpose or a common design and understanding" with his co-conspirators to possess with intent to distribute and to distribute cocaine. *United States v. Kendall,* 766 F.2d 1426, 1431 (10th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986); *United States v. Dickey,* 736 F.2d 571, 581–82 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). We have held that the agreement may be inferred from the facts and circumstances of the case, *Kendall,* 766 F.2d at 1431; *United States v. Andrews,* 585 F.2d 961, 964 (10th Cir.1978), but the evidence must demonstrate "the essential element of interdependence" among the co-conspirators. *Dickey,* 736 F.2d at 582 ("each alleged coconspirator must depend on the successful operation of each 'link' in the chain to achieve the common goal."). Where several separate transactions are involved, as here, we must determine whether each co-conspirator's activities "constituted essential and integral steps toward the realization of a common, illicit goal." *United States v. Brewer,* 630 F.2d 795, 799 (10th Cir.1980).

We have held that "proof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy...." *United States v. McIntyre,* 836 F.2d 467, 471 (10th Cir.1987) (quoting *United States v. Watson,* 594 F.2d 1330, 1337 (10th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979)). One who merely purchases drugs or other property from a conspirator does not thereby become a member of the conspiracy. The reason is that guilt remains individual and personal, even as respects conspiracies, and is not a matter of mass application. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Mere association with conspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy. *Dickey* at 585; *Kendall* at 1432.

Fox relies heavily on *United States v. McIntyre.* There we reversed a conspiracy conviction because the evidence did not establish that the defendant shared a "common goal" with his alleged coconspirators to possess and distribute cocaine. 836 F.2d at 471–72. The government relied essentially on evidence of the defendant's conversation with a government informant in which he disclosed that his former sources in Tulsa were unavailable, that he had a source in Oklahoma City; that the couple made a subsequent purchase of cocaine from another source; that defendant used $75 of his money and $300 the informant gave him for that purchase; and that the defendant gave the informant some of the cocaine and kept the remainder. The government also relied on two other instances in which the defendant purchased cocaine from other sources and shared it with the informant and others. We held that this evidence did not reveal a common goal of the defendant with the informant or the various sellers to possess and distribute cocaine; there was no indication that the defendant was making a profit or distributing cocaine when he merely shared his purchases with his friends present at the time of sale. 836 F.2d at 471. We noted that the evidence in *McIntyre* failed to establish the essential element of interdependence, i.e., that each alleged coconspirator must depend on the operation of each link in the chain to achieve the common goal. *Id.*

Here, however, the government points to significant evidence in support of its argument that Fox knowingly and willingly joined in a conspiracy. First, there was evidence that Moresco and Fox regularly met during the Fall of 1987 to discuss drug

transactions and, on at least three occasions, executed drug transactions for the purpose of maintaining a suitable inventory of cocaine for distribution; that Moresco and Fox periodically traveled together to Las Vegas to buy cocaine from their supplier, Steve Boubon; that they pooled their money so that Moresco could make large purchases of cocaine at a favorable price; that Fox knew the purpose of these trips to Las Vegas—and, by implication, the object of the alleged conspiracy—and Fox received his share of the cocaine upon their return to Denver. The government argues that this evidence demonstrates an ongoing relationship, or an ongoing course of conduct between Fox, Moresco and Boubon with but a single unlawful purpose: to purchase and distribute cocaine.

■ Second, the evidence shows that Fox attended and actively participated in the November 25 meeting with Moresco, agent Castillo, and the confidential informant, Irene Jasick. There Moresco said to Castillo, in Fox's presence and without objection by him, that Fox was his associate responsible for the southern part of Denver in the "coke traffic." At that meeting, according to agent Castillo, Fox expressed his readiness to purchase one kilogram of cocaine for $16,000, described how he and Moresco conducted their drug trafficking business in the Denver area, and discussed an elaborate scheme to carry out an eventual purchase. Although the only testimony about the conversation came from agent Castillo,[6] the jury was entitled to believe him. It is not our function to assess the credibility of the witnesses on appeal; that task is reserved for the jury. *United States v. Twilligear*, 460 F.2d 79, 82 (10th Cir.1972).

Finally, there was evidence that Fox traveled to Las Vegas with Moresco on December 1, 1987. The government points to Moresco's testimony that the purpose of that trip was to introduce Fox to Boubon, so that the two men could deal with each other directly, and argues that the jury could reasonably infer from that testimony that such a meeting would further the common purpose of the conspiracy.

Viewing the evidence in the light most favorable to the government, as we must, we believe the government proved that Moresco and Fox had formed a tacit agreement to violate the federal narcotics laws. The evidence supports the conclusion that Fox and Moresco, acting together and with the cooperation of their coconspirator Steve Boubon, conspired to purchase cocaine in Las Vegas with the intent to transport it to Colorado for distribution. *See United States v. Doran*, 882 F.2d 1511, 1527 (10th Cir.1989). We are persuaded that the evidence sufficiently establishes the necessary interdependence among the co-conspirators. The scheme for distributing cocaine for profit in Denver depended for its success on the successful achievement of several integrated steps, including regular meetings between Fox and Moresco in Denver, the pooling of their resources to purchase drugs, and the several wholesale cocaine purchases from Boubon in Las Vegas. Although much of the evidence is circumstantial, by their very nature conspiracies are often provable only by circumstantial evidence. *See, e.g., Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Peveto*, 881 F.2d 844, 855 n. 12 (10th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989).

Fox argues that the several transactions he conducted with Moresco, prior to the November 25 meeting, fail to establish a conspiratorial relationship. At best, Fox says, the evidence shows the existence of a buyer-seller relationship between Fox and Moresco which, by itself, is insufficient to tie him to a larger conspiracy. *See McIntyre*, 836 F.2d at 471; *Watson*, 594 F.2d at 1337. Fox argues that the government has failed to show any interdependence among

---

**6.** Neither the informant, Ms. Jasick, nor the defendant testified. Moresco's testimony is of limited value because neither the prosecutor nor the defense attorney significantly explored this area. It was not until his cross-examina- tion that Moresco first testified about the meet- ing, and then he testified only about his subse- quent phone call to Castillo advising him that he could not go through with the deal because someone had stolen $25,000 from him.

these separate transactions, or any relationship—other than the prior association of Fox and Moresco—between these transactions and the alleged November 25 conspiratorial agreement. We disagree. The evidence we have reviewed earlier gives ample support instead for a conclusion that Fox did knowingly join and participate in the cocaine conspiracy.

 Finally, Fox argues that even if the meeting at Denny's is interpreted as showing an agreement, or part of a larger agreement, the phone call five days later from Moresco to Castillo constituted a withdrawal from any proposed conspiracy. We disagree. "In order to withdraw from a conspiracy an individual must take affirmative action, either making a clean breast to the authorities or communicating his withdrawal in a manner reasonably calculated to reach his co-conspirators." *United States v. Parnell*, 581 F.2d 1374, 1384 (10th Cir.), *cert. denied*, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1978). "The burden of establishing withdrawal is on the defendant." *Id.* Fox's presence with Moresco in Las Vegas on December 1 belies his claim of withdrawal on the previous day, and we are unpersuaded that there was proof that Fox made any serious attempt to renounce his participation in the overall conspiracy. In any event, even an effective withdrawal would exonerate Fox only for future crimes the remaining conspirators might commit. *United States v. Gonzalez*, 797 F.2d 915, 916–17 (10th Cir. 1986).

We are convinced that the evidence, direct and circumstantial, and the reasonable inferences drawn therefrom, were sufficient to support Fox's conviction for conspiracy to possess with intent to distribute and to distribute cocaine, as charged in Count One.

## IV. *The Defendant's Separate Transaction Instruction*

Fox argues further that the trial judge erred in refusing to give his tendered instruction on his defense theory that what "the evidence proved amounted to a series of separate transactions, not a conspiracy." Appellant's Opening Brief at 10. Defendant cites *United States v. McIntyre*, 836 F.2d 467 (10th Cir.1987), and *United States v. Kendall*, 766 F.2d 1426 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986), *inter alia*, and says the law of conspiracy is confusing and that looking at the evidence as a whole, there was a critical question whether the scenario presented amounted to a conspiracy or a series of separate transactions. *Id.* at 12.

 "Where there is evidence in the record supporting his theory, a defendant in a criminal case is entitled to an instruction to the jury concerning his theory of defense and failure to so instruct is reversible error." *United States v. Jenkins*, 701 F.2d 850, 858 (10th Cir.1983); *see also United States v. Hopkins*, 744 F.2d 716, 717 (10th Cir.1984) (en banc). However, the trial judge is given considerable discretion in tailoring and formulating the instructions. *E.g., United States v. Nolan*, 551 F.2d 266, 274–75 (10th Cir.), *cert. denied*, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977). The court need not follow the exact language of a defense instruction as long as the court's instructions correctly state the law and fairly and adequately cover the issues presented. *United States v. Pack*, 773 F.2d 261, 267 (10th Cir.1985); *United States v. Jenkins*, 701 F.2d at 858; *United States v. Nolan*, 551 F.2d 266, 274–75 (10th Cir.), *cert. denied*, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977).

 Here we are satisfied that the charge as a whole adequately instructed the jury, taking defendant Fox's theory into account.[7] The charge covered the essential requirements for a finding of conspiracy here; this contrasted with acts amounting only to separate transactions. Instruction 17 stated plainly the essentials of the conspiracy that was charged—from at least August 1, 1987, until approximately December 5, 1987, Moresco, Fox, Dente and Boubon did knowingly conspire and combine to knowingly and intentionally

---

**7.** The pertinent instructions are reproduced in the Appendix to this opinion.

possess with intent to distribute and to distribute cocaine.

Instruction 20 defined a conspiracy as a combination of two or more persons to accomplish an unlawful purpose. It stated further "mere similarity of conduct among various persons, and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy." The court also charged the jury that what the evidence "must show beyond a reasonable doubt, in order to establish proof that a conspiracy existed, is that the members in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan."

Moreover, Instruction 21 made it clear that "a person who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator." It stated that before a conspiracy could be found, the evidence "must show beyond a reasonable doubt that the conspiracy was knowingly formed, and that the Defendant, or other person who is claimed to have been a member, willfully participated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy."

The instructions covered the point made in *Kendall*, 766 F.2d at 1432, that neither the defendant's "knowledge alone nor his mere association with the conspirators, however, is enough to convict him of conspiracy." Association alone would not be enough, under the charge given, for conviction of conspiracy; it was required instead that the conspiracy was knowingly formed and that the defendant willfully participated in the unlawful plan.

Viewing the charge as a whole, we believe the jury was adequately instructed.

*See United States v. Orr*, 825 F.2d 1537, 1542 and n. 3 (11th Cir.1987) (holding sufficient instructions similar to those given in the instant case, although a specific buyer-seller type instruction was requested); *United States v. Lively*, 803 F.2d 1124, 1128–29 (11th Cir.1986) (same). *But see United States v. Douglas*, 818 F.2d 1317, 1320–23 (7th Cir.1987); *United States v. Prieskorn*, 658 F.2d 631, 636 (8th Cir.1981). "[T]he sufficiency of the instructions is not determined by giving or not giving particular instructions, but rather by viewing the instructions as a whole." *United States v. Burns*, 624 F.2d 95, 105 (10th Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980). In sum, we hold there was no reversible error committed by the trial judge in refusing to give the tendered instruction.

## V. *The Travel Act Violation*

Fox finally argues that the evidence does not support his conviction under the Travel Act, 18 U.S.C. § 1952 (1988), and therefore that the district court erred in refusing to grant his motion for judgment of acquittal on that count at the close of the government's case. He says that the government proved only sporadic, casual involvement in an unlawful activity, a series of separate transactions, instead of a continuous course of unlawful conduct, and therefore that the evidence fails to establish the requisite "business enterprise." *See* 18 U.S.C. § 1952(b)(1) (1988); *United States v. Kendall*, 766 F.2d 1426, 1434 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986).

Fox was charged in Count Six of the indictment with willfully and knowingly traveling in interstate commerce with the intent to "promote, carry on and facilitate the promotion and carrying on of an unlawful activity, to wit: the business enterprise of distributing cocaine," in violation of 18 U.S.C. § 1952 (1988)[8] and 18 U.S.C. § 2

---

**8.** 18 U.S.C. § 1952 provides in pertinent part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or

foreign commerce, including the mail, with intent to—

. . . . .

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, manage-

(1982). At the close of the government's case, Fox unsuccessfully moved for judgment of acquittal as to Count Six, arguing as he does here, that the government failed to establish the existence of a business enterprise within the meaning of the Travel Act.

■ The Travel Act defines unlawful activity to include "any business enterprise involving ... narcotics or controlled substances." 18 U.S.C. § 1952(b)(1). In *Kendall*, we held that the term "business enterprise" means a continuing course of conduct, rather than sporadic casual involvement in a proscribed activity. 766 F.2d at 1434 (*citing Rewis v. United States*, 401 U.S. 808, 811 n. 6, 91 S.Ct. 1056, 1059 n. 6, 28 L.Ed.2d 493 (1971)); *see also United States v. Peveto*, 881 F.2d 844, 861 (10th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). The legislative history of section 1952 makes clear that individual or isolated drug transactions in interstate commerce cannot be the predicate to a Travel Act violation. *See Senate Comm. on the Judiciary, Racketeering Enterprises—Travel or Transportation,* H.R.Rep. No. 966, 87th Cong., 1st Sess. 3, *reprinted in* 1961 U.S.Code Cong. & Admin.News 2664, 2666 ("individual or isolated violations would not come within the scope of this bill since they do not constitute a continuous course of conduct so as to be a business enterprise.").

■ We have already reviewed in detail the government's evidence against Fox in connection with his conspiracy conviction. There was evidence that Fox regularly met with Moresco to carry on drug transactions; that Fox and Moresco traveled from Colorado to Las Vegas on several occasions, including December 1, 1987, to meet with and purchase quantities of cocaine from their supplier, Steve Boubon; and that Moresco and Fox pooled their money to purchase large quantities of cocaine at a favorable price for eventual distribution in

Colorado. We believe that the record supports an inference that Fox and Moresco were engaged in a continuing business enterprise of purchasing and reselling cocaine for profit, and that they traveled in interstate commerce for the purpose of carrying on that unlawful activity. Furthermore, we are persuaded that there is sufficient evidence from which a jury could reasonably infer that Fox's involvement in the interstate transportation of narcotics was continuous rather than merely "sporadic" or "casual."

Fox's reliance on *United States v. Bates,* 840 F.2d 858 (11th Cir.1988), is misplaced. In *Bates*, the evidence showed only a single, uncompleted act and was otherwise inconclusive: "Mr. Bates' car's odometer showed 30,000 more miles than the average car its age; Mr. Bates was carrying approximately $1,400 in cash; traces of cocaine were found in a concealed compartment in the glove box; Mr. Bates made the highly ambiguous statement: '[t]his is the first time I carried the weapon and the cocaine.'" For seemingly obvious reasons, the court held that the evidence failed to prove that the defendant was involved in an enterprise constituting a continuous course of drug trafficking. *Id.* at 863. It rejected the government's argument that a single act involving the transportation of narcotics can constitute the requisite business enterprise. *Id.* at 862–63. And in any event, the evidence showed that the defendant was stopped in the midst of his travel and therefore could not perform any illegal acts *following* the interstate travel as required by 18 U.S.C. § 1952(a). *Id.* at 862.

Here the record supports the inference that Fox and Moresco engaged in a continuous course of unlawful conduct, rather than only a sporadic casual involvement in a proscribed activity. Viewing the evidence in the light most favorable to the government, as we must, we believe a rea-

---

ment, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs ... (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section, "unlawful activity" means (1) any business enterprise involving ... narcotics or controlled substances....

sonable jury could conclude from the testimony at trial, and the reasonable inferences drawn therefrom, that Fox was guilty beyond a reasonable doubt of violating the Travel Act or of aiding and abetting its violation. Accordingly, the district court did not err in denying Fox's motion for judgment of acquittal as to Count Six of the indictment.

AFFIRMED.

## APPENDIX

The pertinent portions of the district court's instructions to the jury concerning conspiracy were as follows:

Instruction 17. The indictment in this case reads as follows: Count I, the grand jury charges that: From at least August 1st, 1987, until approximately December 5th, 1987, the exact dates unknown to the grand jury, in the State and District of Colorado, and elsewhere, the defendants John Moresco, John Fox, John Dente, and Steve Lee Boubon, an unindicted co-conspirator, did knowingly, willfully and unlawfully conspire, combine, confederate, cooperate and agree with each other and other persons both known and unknown to the grand jury to knowingly and intentionally possess with intent to distribute and to distribute cocaine, a controlled substance listed in Schedule II, Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 841(a)(1).

The indictment then alleges that certain overt acts were committed by members of the alleged conspiracy, in furtherance of the conspiracy. All in violation of Title 21, United States Code, Section 846.

. . . .

Instruction 20. A conspiracy is a combination of two or more persons, by concerted action, to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means.

So, a conspiracy is a kind of partnership in criminal purposes, in which each member becomes the agent of every other member. The gist of the offense is a combination or agreement to disobey, or to disregard, the law.

Mere similarity of conduct among various persons, and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.

However, the evidence in the case need not show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished.

What the evidence in the case must show beyond a reasonable doubt, in order to establish proof that a conspiracy existed, is that the members in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.

The evidence in the case need not establish that all the means or methods set forth in the indictment were agreed upon to carry out the alleged conspiracy, nor that all means or methods, which were agreed upon, were actually used or put into operation, nor that all of the persons charged to have been members of the alleged conspiracy were such.

What the evidence in the case must establish beyond a reasonable doubt is that the alleged conspiracy was knowingly formed, and that one or more of the means or methods described in the indictment were agreed upon to be used, in an effort to effect or accomplish some object or purpose of the conspiracy, as charged in the indictment, and that two or more persons, including one or more of the accused, were knowingly members of the conspiracy, as charged in the indictment.

Instruction 21. One may become a member of a conspiracy without full knowledge of all the details of the conspiracy. On the other hand, a person who has no knowledge of a conspiracy,

but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.

Before the jury may find that a defendant, or any other person, has become a member of a conspiracy, the evidence in the case must show beyond a reasonable doubt that the conspiracy was knowingly formed, and that the Defendant, or other person who is claimed to have been a member, willfully participated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy.

. . . .

(VI R. 249–50, 251–53.)

McKAY, Circuit Judge, dissenting:

Regrettably I must dissent from the court's judgment in this case. I do not disagree with any of the court's opinion except Section IV dealing with the trial court's refusal to give defendant's requested instruction concerning separate transactions. It clearly was defendant's central theory of the case in the conspiracy count. I consider it controlling because, in my view, the failure to give the instruction when requested in this case is reversible error.

As I understand the court's opinion, it does not deny that the law in this circuit recognizes that a legitimate defense to a conspiracy charge is that the relationship consisted of a series of independent transactions lacking agreement to engage in the overall conduct comprising the elements of a unified conspiracy. *United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir.1987); *United States v. Kendall*, 766 F.2d 1426 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986); *United States v. Watson*, 594 F.2d 1330, 1337 (10th Cir.1979). Nor do I understand the court to reject defendant's claim that the evidence in this case would support such a theory and corresponding instruction. The court merely concludes that the instructions given were adequate because they are a correct statement of the law of conspiracy.

I do not quarrel with the notion that the instructions on conspiracy were correct so far as they went. However, in the complex area of conspiracy law, the defendant was entitled to more. He was entitled to one of the many subsets of conspiracy instructions more clearly informing the jury of his theory. Indeed, as the court notes, even in this case the trial court gave one subset of instruction concerning "similarity of conduct," "association," and "assembling together" as a way of contrasting it for clarity's sake with the general positive statement of what conspiracy is. Majority opinion at 1517 (discussing Instruction 20). For the same reasons that defendant was entitled to that instruction (cited with approval by the court), I believe it was error not to give a requested instruction on a "series of transactions." Indeed, I consider it more compelling than the merely "associating together" or "similarity of conduct" instructions because the "series of transactions" are more likely to be confused with a true conspiracy in the minds of the jury—because they are, in fact, "deals." I believe the court has tacitly acknowledged that giving the instruction would not have been error; I believe refusing it was error. I would reverse.