**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 17 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

MILAN MATOUSEK,

      Defendant-Appellant.

No. 04-3187
(District of Kansas)
(D.C. No. 03-CR-40106-JAR)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **McWILLIAMS**, and **TYMKOVICH**, Circuit Judges.

## I.  INTRODUCTION

Defendant-appellant Milan Matousek was convicted after a bench trial of

conspiracy to transport and harbor aliens in violation of 8 U.S.C. § 1324.

Matousek now appeals, challenging his conviction based on sufficiency of the

evidence, the denial of an opportunity for closing argument, and the improper

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

admission of a summary exhibit. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** Matousek's conviction.

## II.    BACKGROUND

Matousek, a citizen of the Czech Republic, was arrested as part of an investigation by U.S. Immigration and Customs Enforcement ("ICE") into an employee leasing company based in south Florida that recruited Eastern European citizens to enter the United States on tourist visas and then employed them in violation of those visas. The investigation revealed this organization was operating in six to twelve states and involved approximately 750 illegal alien workers.

Matousek had been recruited to work in America, possessed a valid B-2 tourist visa, and was working on a hog farm in Seneca, Kansas when he was arrested. The farm where Matousek worked was part of a large agricultural operation–J-6 Farms, Fairview Express, K-9, and Fairview Mills–run by John Kramer. At the farm Matousek worked approximately seventy hours a week, weaning baby pigs and cleaning hog pens.

Kramer had contracted with a Florida corporation, known variously as J&K Express Services, J&K Professional Services, and S&V Commercial Services, to supply his operation with Eastern European labor. The Florida companies promised to complete the proper paperwork and withhold employment taxes for

the alien workers. The employee leasing companies would charge Kramer an hourly wage per worker, pay the workers a reduced amount, and pocket the difference. Typically, the farm would fax an invoice to the employee leasing companies indicating which workers had worked how many hours and how much they were due to be paid. The workers at Kramer's farms received their paychecks from these Florida companies via Federal Express.

When Kramer's agricultural operation needed more workers, it would contact the employee leasing corporations. The companies would then let Kramer know when new employees would be arriving. Paul or Pavel Preus, the onetime owner of S&V Commercial Services, would sometimes direct Kramer's office manager, Colleen Terpening, to have Matousek contact Preus. Preus would then arrange for Matousek to transport the workers. During his time at the farm, Matousek made five trips to and from transportation hubs in Kansas City and Topeka, during which he picked up and transported newly arrived alien workers. Matousek used his own car for these trips and was reimbursed approximately forty dollars per trip by Preus. On one occasion Matousek also paid for a night's stay at a hotel for the workers whom he was transporting. He was later reimbursed by Preus for this expense. There was also testimony that Federal Express records indicated Matousek received some of the paychecks from S&V Commercial Services and would then distribute them to the farm workers.

One of the workers that Matousek transported was Michal Preclik, also a Czech citizen. Preclik testified that he was recruited to work in the United States in what he believed was a legal arrangement. When Preclik arrived at the Kansas City International Airport, he was met by Matousek. Matousek transported Preclik and two other Czech citizens to a local motel. Preclik testified that while he only saw Matousek "maybe five, six times," in his opinion Matousek "was the only person who was speaking with these guys in Florida, and he was taking care of I think actually everything."

In September 2003 Matousek was indicted on one count of conspiracy to transport and harbor aliens in violation of 8 U.S.C. § 1324.[1] Matousek was

---

[1]In relevant part, 8 U.S.C. § 1324 imposes criminal penalties upon any person who:

(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

(continued...)

-4-

convicted after a one-day bench trial and sentenced to eight months' imprisonment. The district court also directed that Matousek be surrendered to immigration officials for deportation after completion of his prison sentence.[2] Matousek filed a timely notice of appeal and is now challenging his conviction. Matousek contends that his conviction should be reversed because (1) the evidence was insufficient to support his conspiracy conviction, (2) the district court committed plain error when it denied him an opportunity to present a closing argument, and (3) the district court erred in admitting a summary exhibit into evidence.

III. DISCUSSION

A. Sufficiency of the Evidence

A challenge to the sufficiency of the evidence is a legal question reviewed *de novo*. *United States v. Lewis*, 240 F.3d 866, 870 (10th Cir. 2001). Based on the record viewed in the light most favorable to the government, this court must

---

[1](...continued)
(v)(I) engages in any conspiracy to commit any of the preceding acts, or

(II) aids or abets the commission of any of the preceding acts . . . .

8 U.S.C. § 1324(a)(1)(A)(ii)–(v)(II).

[2]At oral argument counsel for the government stated that Matousek had been deported in July 2004. This fact, however, does not affect this court's review. *See Sibron v. New York*, 392 U.S. 40, 50-58 (1968) (concluding appeal is not mooted by defendant's release from prison).

determine whether a reasonable factfinder could find the defendant guilty beyond a reasonable doubt. *See id.*

To prove the existence of a conspiracy, the government must show "(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Heckard*, 238 F.3d 1222, 1229 (10th Cir. 2001) (quotation omitted). Matousek argues that the evidence was not sufficient to establish interdependence among himself and his alleged coconspirators.

The element of interdependence developed as a way to prove the existence of a single conspiracy as distinguished from several, separate transactions. *See United States v. Petersen*, 611 F.2d 1313, 1325-27 (10th Cir. 1979) (discussing development of conspiracy case law).[3] A single conspiracy requires that the alleged coconspirators possess "a common, illicit goal" which is established by a showing of interdependence. *United States v. Dickey*, 736 F.2d 571, 582 (10th Cir. 1984). "Interdependence exists if the alleged coconspirators were united in a common unlawful goal or purpose and if a defendant's activities facilitated the endeavors of another alleged coconspirator or facilitated the venture as a whole."

---

[3]Much of the conspiracy case law involves drug distribution conspiracies. The element of interdependence is not, however, restricted to such cases. *See United States v. Petersen*, 611 F.2d 1313, 1326 (10th Cir. 1979).

*United States v. Ailsworth*, 138 F.3d 843, 851 (10th Cir. 1998) (quotation omitted). Interdependence requires that "each alleged coconspirator must depend on the successful operation of each 'link' in the chain to achieve the common goal." *Dickey*, 736 F.2d at 582. This court has also characterized interdependence as requiring "proof that the conspirators intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *Heckard*, 238 F.3d at 1231-32 (alteration omitted) (quoting *United States v. Evans*, 970 F.2d 663, 671 (10th Cir. 1992)). Matousek asserts that the government failed to demonstrate interdependence because the evidence did not show that Matousek received any personal benefit from participating in the alleged conspiracy or that the success of the criminal enterprise depended on Matousek's involvement.

Matousek misinterprets our case law regarding interdependence to suggest that a showing of "shared mutual benefit" requires the government to prove that a defendant personally profits from a conspiracy. By requiring a showing of mutual benefit, the court in *United States v. Evans*, for example, was attempting to distinguish between groups of individuals separately distributing drugs in a single area and those same individuals doing so as part of a conspiracy. 970 F.2d at 670-71; *see also United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990) ("Mere association with conspirators, even with knowledge of their involvement

in crime, is insufficient to prove participation in their conspiracy."). Matousek also relies on *United States v. McIntyre*, another case involving an alleged drug distribution conspiracy. 836 F.2d 467 (10th Cir. 1987). In concluding that the evidence was insufficient to prove that the defendant was part of a conspiracy, the *McIntyre* court relied in part on the fact that there was no evidence the defendant made a profit. *Id.* at 471-72. Acknowledging that profit is one indication of interdependence in a greater scheme for distributing drugs, however, does not mean that personal profit must be shown in every conspiracy case. To establish interdependence, the government does not need to show that a defendant personally profited from involvement in the criminal conspiracy, but only that a defendant played an essential role in the furtherance of a common, illicit goal. *See Evans*, 970 F.2d at 670-71; *McIntyre*, 836 F.2d at 471.

Matousek is also wrong to suggest that equating interdependence with evidence that the defendant played an essential role in the conspiracy necessitates a showing that the success of the venture literally depended on the defendant's personal involvement. The interdependence inquiry is not whether the defendant himself was the linchpin in the conspiracy, but whether the defendant was one of the operational links in the chain. *See Evans*, 970 F.2d at 670; *Fox*, 902 F.2d at 1514.

When viewed in the light most favorable to the government, there was sufficient evidence to establish interdependence among Matousek and his coconspirators. The alleged conspiracy involved supplying illegal alien workers to American employers. The success of the operation depended on the ability to recruit Eastern European labor and transport the labor to and within the United States. *Cf. United States v. Edwards*, 69 F.3d 419, 431-32 (10th Cir. 1995). This success did not rise or fall on Matousek's individual involvement, but it certainly did depend on the organization's ability to transport and deliver illegal workers.

The government put on sufficient evidence to demonstrate that Matousek transported illegal workers, thus demonstrating that Matousek played an essential role in the criminal conspiracy. Matousek admitted to investigators that he transported aliens from the Kansas City International Airport and the Topeka bus station to the farm in Seneca, Kansas. Matousek's trips were coordinated with and paid for by Preus, the person in control of S&V Commercial Services. Matousek admitted that he made approximately five different trips. Matousek fronted the money to pay for one night at the hotel housing the newly arrived workers. Douglas Alan Bemiss, a supervisor with ICE, also testified that Federal Express records indicated Matousek received and distributed paychecks from S&V Commercial Services. A rational factfinder could reasonably find interdependence between Matousek and his alleged coconspirators in their scheme

to supply illegal labor to American employers. The evidence was therefore sufficient to support Matousek's conviction.

## B. Denial of Closing Arguments

After the government rested its case and the defense offered into evidence the first recorded sworn statement of Matousek, which had previously been suppressed, the defense moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. Both parties offered arguments for and against the motion. The court denied the Rule 29 motion and at that point the following exchange occurred:

> THE COURT: All right. Are you all ready to proceed, Ms. Evans, Mr. Redmond?[4] Would you like to take a 10-minute break?
>
> MS. EVANS: Your Honor, we have no other evidence to present.
>
> THE COURT: All right. So the defendant rests?
>
> MS. EVANS: Yes, Your Honor.
>
> THE COURT: All right. Well, I've just analyzed whether there was sufficient evidence to go to the jury in this case on a Rule 29 analysis, which, of course, is a different analysis that I must perform to determine whether the government has met its burden beyond a reasonable doubt. But I'm prepared to rule at this time as well on that.
> This defendant has been charged with knowingly and willfully combining, conspiring, confederating and agreeing on or about May 29, 2003, and before, back to some unknown date, here in Kansas,

---

[4]Melody Evans and Kirk Redmond served as Matousek's defense counsel at trial.

with persons both known and unknown to the grand jury, to transport, conceal, harbor, and shield from detection in and around–in and surrounding, Seneca, Kansas, aliens, knowing and in reckless disregard of the fact that the aliens had come to, entered, and remained here in the United States in violation of law, all for the purpose of commercial advantage and private financial gain. . . .

Without taking a pause or asking the parties if they would like to present closing arguments, the district court began orally ruling on Matousek's guilt. At no time during the ruling, which took up eleven pages of transcript, did defense counsel raise an objection.

Matousek contends that his conviction should be reversed because the district court denied him his Sixth Amendment right to have his defense counsel present a closing argument. Because no contemporaneous objection was made, this court reviews for plain error. *United States v. Stenzel*, 49 F.3d 658, 661 (10th Cir. 1995); *see also* Fed. R. Crim. P. 52(b).

This court's opinion in *United States v. Stenzel* is directly on point and controlling. In that case the district court announced its findings of fact and conclusions of law at the close of evidence. *Stenzel*, 49 F.3d at 661. Defense counsel interrupted the court to raise certain motions and asked the judge to review an exhibit. *Id.* After the exchange concluded, the district court continued to announce its ruling and defense counsel made no objection to the lack of an opportunity to present closing argument. *Id.* This court stated that:

[a] defendant's right to effective assistance of counsel includes the right to present closing argument. *Herring v. New York*, 422 U.S. 853, 865 (1975). This guarantee, like other constitutional rights, may be waived. A waiver must be knowing and intentional, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), *overruled on other grounds*, *Edwards v. Arizona*, 451 U.S. 477 (1981), but a defendant may not fail to object to perceived error and thereby invite a court to commit error.

*Id.* The *Stenzel* court then concluded that defense counsel had waived the right to present oral argument. *Id.* at 661-62.

In the present case, after ruling on the Rule 29 motion, the court asked defense counsel if they would like to take a ten-minute recess and when counsel declined, the court asked if the defense rested. As in *Stenzel*, there was no announcement denying closing argument nor any specific request by defense counsel to present a closing argument. *See Stenzel*, 49 F.3d at 661. During the one-day bench trial defense counsel showed no hesitation in interrupting the court to raise various objections, and counsel's failure to do so "as the court began rendering judgment indicates that [] silence concerning closing argument might reasonably be viewed as a strategic choice made at the close of the trial." *Id.* Moreover, defense counsel made no post-trial motions to attempt to correct the district court's error. *See United States v. Martinez*, 974 F.2d 589, 592 (5th Cir. 1992). Counsel's failure to object under these circumstances may be deemed a tactical choice waiving the right to present closing argument. *See Stenzel*, 49 F.3d at 661-62.

Matousek contends, however, that no waiver can be inferred because counsel lacked a meaningful opportunity to object. It may very well be true that "where the announcement of the verdict comes on the heels of the close of evidence," waiver will not be inferred, *Hunter v. Moore*, 304 F.3d 1066, 1071 (11th Cir. 2002) (quotation omitted), but this is not such a case. In *Hunter v. Moore*, for example, the Eleventh Circuit concluded that counsel did not have a meaningful opportunity to object because the district court immediately pronounced the defendant guilty upon the close of evidence. 304 F.3d at 1068, 1072. In the present case the district court did not immediately pronounce Matousek guilty, but began by reciting the charges against Matousek, providing defense counsel with an opportunity to object if they so chose. Similarly, the present case is distinguishable from *United States v. King*, 650 F.2d 534 (4th Cir. 1981), upon which Matousek also relies. After the parties rested in *King*, the magistrate judge reviewed the evidence presented and promptly found the defendant guilty. *Id.* at 536. Defense counsel objected, saying he did not intend to waive closing argument, and the district court responded that defense counsel could offer closing arguments but the court had "already made [its] finding" and any argument would not "change anything." *Id.* at 536. Matousek argues that this occurred in the instant case because the district court stated that it was prepared to rule on whether the government had met its burden. The court's statement,

however, does not suggest the court's mind was made up or indicate which way the court was going to rule and, therefore, did not make closing arguments futile. *Compare id.* at 537 (concluding that "a defendant's interests can[not] be effectively advocated" in a situation where the judge stated that closing arguments would not change his mind). Because defense counsel failed to object when there was a meaningful opportunity to do so, counsel effectively waived the right to present closing argument and there was therefore no error.

## C. Admission of the Summary Exhibit

During the trial, the court admitted into evidence a spreadsheet created by Agent Douglas Bemiss of ICE. The spreadsheet, based on Bemiss' investigation at Fairview Mills and J-6 Farms, included the names of alien workers, their dates of birth, their places of birth, the codes assigned to them when they entered the United States (i.e., the type of visa), and the dates they were admitted. The spreadsheet was created with information obtained from employee invoices held by Fairview Mills and J-6 Farms, ICE database records, and witness interviews. Defense counsel objected to the admission of the spreadsheet based on hearsay, lack of foundation, and improper admission of a summary exhibit. The objection was limited to the places of birth and codes of admission.[5]

---

[5]In response to a request for clarification from the district court, defense counsel stated:

(continued...)

Matousek argues that the government failed to satisfy the predicate requirements of Fed. R. Evid. 1006 because the documents summarized in the spreadsheet were not voluminous and defense counsel was never afforded an opportunity to examine the underlying documents.[6] In addition to satisfying the predicates of Rule 1006, the admission of summary exhibits is conditioned on the requirement that the evidence upon which they are based must be admissible.

---

[5](...continued)
Part of the government's burden is to prove that these people are actually aliens here working illegally. And to put their place of birth, which was either derived from the interview that Agent Bemiss did directly, or probably from an interview with another agent or immigration officer, that was then entered into the ICE unit, we have multiple hearsay problems here and questions about where the information as to the place of birth came from. And I have not seen either the records that support where their place of birth comes from in a way that we can challenge that this was the case.

There's also a question about the code of entry, whether there was any adjustment after they entered into the United States. A person may come into the United States on a B-1 or a B-2 but then have an adjustment about their status. So we don't have or know any of that information, with the exception of Mr. Matousek, who is in fact listed on here.

[6]Under Rule 1006 of the Federal Rules of Evidence,

[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed. R. Evid. 1006.

*United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999). Matousek asserts that the exhibit contained multiple levels of hearsay and therefore admission of the spreadsheet violated Fed. R. Evid. 1006 and his rights under the Confrontation Clause of the Sixth Amendment.

Assuming it was an error of constitutional magnitude for the district court to admit the summary exhibit, the error is harmless beyond a reasonable doubt. *See United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). The spreadsheet was introduced to establish the alienage of the workers. As the government demonstrates, however, even without the admission of the summary exhibit, the evidence of the alienage of the persons involved was uncontested. Michal Preclik, a Czech citizen, testified that Matousek transported Preclik and two other Czech citizens from the airport to a hotel. Furthermore, during his testimony, Agent Bemiss recounted the interview with Matousek in which Matousek indicated he knew the status of the workers. In relevant part the exchange between Matousek and the investigators, as read by Agent Bemiss, was as follows:

> The question was: "Let me ask you a hypothetical question: if you had a green card, would you work for Pavel?" Answer: "(Chuckles.) If I would have a green card, I would probably work on my own behalf freely." . . .
> Question: "What do you mean by 'freely'?" "Well if I would have a green card I would find my work myself, I would make the deal with the employer myself, I would pay the taxes, the employer

would pay taxes, I would not have to pay any kind of a fee because he is a contractor, just to get a job."

Question: "Is it safe to say that only an unauthorized worker would work for Pavel?" Answer: "Well that's the reality of it because nobody really does have a work permit so they have no chance to find work so they are actually forced to work for an individual like Pavel–in order to make some money."

Matousek's statements demonstrate that Matousek, a citizen of the Czech Republic, and the other farm workers were working illegally in the United States. Setting aside the spreadsheet, the evidence presented was sufficient to establish the alienage of the workers beyond a reasonable doubt and the admission of the summary exhibit, even if constitutionally erroneous, was therefore harmless.

## IV. CONCLUSION

For the foregoing reasons, this court **AFFIRMS** Matousek's conviction.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge