[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-14577

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 11, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-21042-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MOHAMED SAMIR ABDELAZZ,
BILLY JACK LAWLER,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 11, 2005)

Before BIRCH, CARNES, and RONEY, Circuit Judges.

PER CURIAM:

Mohamed Samir Abdelazz and Billy Jack Lawler were each convicted of one count of conspiring to acquire food stamps for less than face value and redeem them, in violation of 18 U.S.C. § 371, 7 U.S.C. § 2024(b), (c). Lawler was also convicted of thirty-five counts of illegally redeeming food stamps in violation of 7 U.S.C. § 2024(c), and nine counts of money laundering, in violation of 18 U.S.C. § 1957.

Abdelazz's only issue on appeal is whether the district court erred by not giving the jury a special instruction on withdrawal from the conspiracy. Lawler raises a number of issues arising from the district court's admission of an out-of-court statement made by a government informant, and issues involving his sentence also.

## I.

Since 1988, there has been a grocery store of one name or another at 1502 NW 60th Street in Liberty City, Florida. Lawler began working at the store in the early 1990s. At that time, it was owned by Johnny Williams and was known as "Orange Heights General Store." In 1992, the store was leased and eventually purchased by Fuad Ajarmeh (a.k.a. Freddy) and the name of the store was changed to "Freddy's." Freddy applied for and was allowed to participate in the United

States Department of Agriculture food stamp program. Zuhair Ibhah (a.k.a. George) helped Freddy run the store.

In February 1995, "Freddy's" was notified by the USDA that it was permanently disqualified from the food stamp program because of exceptionally high food stamp redemptions. As a consequence of the disqualification, Freddy and George were permanently barred from accepting or redeeming food stamps.

On April 7, 1995 the store was reincorporated as "King Food Grocery Store, Inc.," with Samith Ghazawi as the new owner. Ghazawi had been an employee of "Freddy's." Ghazawi testified at trial that Freddy and George had pressured him into signing the ownership and incorporation papers; that he thought he would be fired if he did not sign them. He also testified that he did not know that the purpose of his being named the owner in those papers was to further a food stamp fraud scheme. After approximately nine months, Ghazawi demanded he be removed from the ownership documents. Shortly thereafter, in December 1995, "King Food Grocery" was voluntarily removed from the food stamp program.

On February 15, 1996 the store was reincorporated as "Tyson Grocery," with the articles of incorporation naming appellant Lawler as the owner, president, treasurer, and secretary. In March 1996 Lawler applied for and was allowed to participate in the USDA food stamp program. About a year and a quarter later, in

3

June 1997, the USDA sent Lawler an "official warning" letter stating that the ratio of food stamp redemptions to total food sales was extremely high, which indicated that violations were likely occurring at the store. Half of a year after that, in January 1998, a "charge letter" was sent to Lawler notifying him that the store was under investigation. Finally, in February 1998, the USDA permanently disqualified "Tyson Grocery" and Lawler from the food stamp program.

The USDA investigation uncovered three transactions that had occurred between November and December 1996 in which appellant Abdelazz, who was working as a cashier at the store, had purchased food stamps from an undercover officer for cash.

On December 19, 2002, a federal grand jury returned an indictment against Abdelazz and Lawler.[1] Both of them were charged with one count of conspiring during the period between November 1996 and February 1998 to acquire food stamps for less than face value and redeem them, in violation of 18 U.S.C. § 371, 7 U.S.C. § 2024(b), (c). Lawler was also charged with thirty-five counts of illegally redeeming food stamps, in violation of 7 U.S.C. § 2024(c), and with nine counts of money laundering, in violation of 18 U.S.C. § 1957.

---

[1] Neither Freddy nor George were indicted.

4

Prior to trial, the government provided notice of its intent to introduce evidence under Fed. R. Evid. 807, the residual hearsay exception. The Rule 807 evidence stemmed from USDA Agent Carol Bennett's use of a confidential informant. Bennett had been investigating "Freddy's," and in July 1993 she had sent Alfonso Hill, a confidential informant, into the store with $230 worth of food stamps to sell for cash. Hill sold the food stamps to an employee in the store for $190. Prior to the transaction, Hill had been outfitted with a transmitter and a recording device. Bennett testified that she had heard the transaction as it was taking place.[2]

The Rule 807 evidence the government sought to introduce was the statement made by Hill to Agent Bennett shortly after the food stamp purchase took place.[3] In that statement, Hill identified the store employee to whom he sold the food stamps as "Billy Jack." Because Hill was unavailable for trial, the government sought to introduce his statement to Bennett under Rule 807, and it was admitted on that basis over Lawler's objections.

---

[2] Lawler contends that the evidence demonstrates that there was no transmitter. Bennett testified that she was monitoring the conversation with a transmitter, and the district court apparently credited her testimony. That is a fact finding, and Lawler has not persuaded us that it is clearly erroneous.

[3] The actual recording of the sale transaction was also played for the jury. Lawler does not challenge the district court's admission of the tape recordings of the actual transaction, only the statements Hill made to Agent Bennett immediately thereafter, recounting the transaction.

During the trial, Abdelazz called no witnesses other than himself. He testified that, after he learned in January 1997 that redeeming food stamps for cash was illegal, he stopped working as a cashier and also began working a different shift. His defense was that he did not have the criminal intent necessary to be a part of the charged conspiracy.

Like Abdelazz, Lawler's only defense at trial was that he lacked the requisite criminal intent. He essentially admitted all the other elements of the crimes that he was charged with except for intent. According to Lawler, Freddy and George were the ring leaders of the food stamp scam, and he was duped into doing their bidding.

In March 2003, following a five-day trial, the jury found both Abdelazz and Lawler guilty on all counts. Afterwards, Lawler filed a motion for a new trial based on newly discovered information about Hill (the confidential informant from 1993); the district court denied that motion.

Abdelazz was sentenced to 42 months imprisonment. Lawler was sentenced to 60 months imprisonment for counts 1 through 36, and 60 months imprisonment for counts 37 through 45, with the sentences to run concurrently.

## II.

According to Abdelazz, he presented sufficient evidence of his withdrawal from the conspiracy to warrant a specific instruction to the jury. He argues that he

6

withdrew from the conspiracy in January 1997. If that were true, he would have a valid defense to the conspiracy charge (the only one against him) because the five year statute of limitation period for conspiracies would have run before the federal grand jury issued its indictment against him. (The five-year period would have run out in January 2002. The grand jury returned its indictment in December 2002.) Abdelazz argues that the district court committed reversible error when it failed to give the jury an instruction on his withdrawal from the conspiracy theory of defense.

We review a district court's refusal to give a proposed jury instruction only for an abuse of discretion. United States v. Puche, 350 F.3d 1137, 1150 (11th Cir. 2003). We won't find an abuse of discretion unless the rejected instruction was substantively correct, the actual charge to the jury did not substantially cover the points, and the defendant's ability to present an effective defense was impaired by the absence of the instruction. United States v. Orr, 825 F.2d 1537, 1542 (11th Cir. 1987). Abdelazz has failed to carry persuade us that there was an abuse of discretion here.

First, it is unclear whether the district court actually denied Abdelazz's proposed instruction. When presented with it, the district court commented that "the language [of the proposed instruction] is horrible" and stated that, on the law,

7

it was "persuaded not to give the instruction." Instead of issuing a ruling at that time, however, the court gave Abdelazz until the following morning to rewrite the instruction and find additional law to support it. The following morning before closing arguments, the district court passed out the jury instructions it was planning to give and asked the parties if there was anything else they wanted the court to consider. Abdelazz did not present the district court with a revised copy of his proposed jury instruction or any additional case law, as the court had requested the preceding day.

Following closing arguments and the district court's instructions to the jury, the judge asked the parties if there were "any issues as to how [he had] presented the instructions." Abdelazz responded, "No, your Honor." After sending the jury to deliberations, the district court judge asked if there was "[a]nything else before we break." Lawler's attorney responded: "I need to renew my partner's objection to his denial, your denial of his special instruction, regarding the statutes of limitations." We need not decide whether this was enough to preserve Abdelazz's request for the instruction or whether he effectively abandoned it by not following the district court's directive and amending his proposed instruction, as directed. We need not, because Abdelazz loses on this contention anyway.

8

As part of his burden of demonstrating that the district court erred by refusing to give his proposed jury instruction, Abdelazz must establish that his proposed instruction was "substantively correct." Orr, 825 F.2d at 1542. He has not done that. We have no way of determining whether the instruction was substantively correct, because Abdelazz failed to include the proposed instruction in the record on appeal.

On a closely related point, we are also unconvinced that the failure to give the instruction "substantially impaired [Abdelazz's] ability to present an effective defense." Id. Abdelazz's defense at trial was that he had no knowledge that receiving food stamps in exchange for cash was illegal—he argued that he did not have the criminal intent necessary to be guilty of a food stamp fraud conspiracy. If the jury had believed Abdelazz, then even without any withdrawal instruction it would have found that Abdelazz was not a part of the conspiracy to begin with. Based on the only defense Abdelazz's pursued at trial, giving an instruction to the jury on withdrawal would have been pointless—a defendant cannot withdraw from a conspiracy that he was never a part of. As a result, Abdelazz's ability to present an effective defense was not substantially impaired by the district court's failure to give a special instruction to the jury on withdrawal. His conviction is due to be affirmed, and he raises no issues about his sentence.

**III.**

As we stated earlier, Lawler's non-sentencing arguments center around the district court's admission of a statement by confidential informant Alfonso Hill to USDA Agent Carol Bennett. The statement arose out of an incident that occurred in July 1993, when Hill went to "Tyson Grocery" at the direction of Agent Bennett to sell food stamps for cash. After the transaction, which was itself covertly tape-recorded, Hill made an untaped statement to Bennett recounting the events in the store, which Bennett wrote down in her debriefing report. In that statement, Hill told her that he had exchanged $230 worth of food stamps for $190 in cash. He also told her that the cashier who had conducted the transaction was "Billy Jack." That was not favorable to Lawler whose full name is Billy Jack Lawler. Over his objection, the district court decided that Hill's statement to Bennet was admissible pursuant to the residual hearsay exception, Fed. R. Evid. 807. Because Bennett could not recall Hill's statement fully and accurately during the trial, the district court permitted Bennett to read the statement to the jury from her debriefing report, pursuant to the recorded recollection hearsay exception, Fed. R. Evid. 803(5). The audio recording of the transaction itself was also played for the jury.

A.

Lawler first argues that, under the Supreme Court's decision in <u>Crawford v.</u> <u>Washington</u>, 541 U.S. 36, 124 S. Ct. 1354 (2004), Hill's statement to Agent Bennett is testimonial and, because Hill was unavailable for cross-examination, the district court erred by introducing that statement.

<u>Crawford</u>, which abrogated <u>Ohio v. Roberts</u>, 448 U.S. 56, 100 S. Ct. 2531 (1980), held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." 541 U.S. at 68, 124 S. Ct. at 1374. This is a bright-line rule: if a statement is testimonial and the defendant did not have a prior opportunity for cross-examination, the declarant must testify at trial for the Confrontation Clause to be satisfied. Put differently, the Confrontation Clause is violated if a testimonial statement is introduced at trial and the defendant did not have an opportunity to cross-examine the declarant.

Hill's statement to Bennett was introduced at trial through Bennett's testimony. Hill did not testify, and Lawler had no prior opportunity to cross-examine Hill. As a result, if Lawler can demonstrate that Hill's statement to Agent Bennett was testimonial, then <u>Crawford</u> establishes that the district court's

11

admission of the statement was a violation of Lawler's Sixth Amendment Confrontation Clause rights.

The Crawford Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" Id. at 68, 124 S. Ct. at 1374. It is not at all clear whether Hill's statement to Agent Bennett is testimonial for purposes of the Crawford rule. Even if we assume that it is and there was a Crawford violation in this case, the error was harmless beyond a reasonable doubt.

A constitutional error must be disregarded if the error is harmless beyond a reasonable doubt. United States v. Candelario, 240 F.3d 1300, 1307 (11th Cir. 2001). The Supreme Court has framed the inquiry in these terms: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" Neder v. United States, 527 U.S. 1, 18, 119 S. Ct. 1827, 1838 (1999). Specifically as to deciding whether a violation of the Confrontation Clause is harmless, the Court has explained that:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986).

Even without Hill's statement to Agent Bennett, the jury was able to hear the actual audio tape of the transaction. The jury also had a written transcript of the audio tape as well as a computer synchronization. Bennett testified that, based on her monitoring the transaction at the time it was made, the transcript accurately reflected what was said and who was speaking during the transaction as reflected on the audio tape. Specifically, Bennett testified that she herself was able to identify one of the voices on the tape was Billy Jack Lawler. Her identification of Lawler was based on her comparison of the voice she heard while monitoring the 1993 transaction and while subsequently listening to the tape recording to Lawler's voice as she heard it in a 1995 court proceeding and at a 1998 deposition.

A portion of the tape recording is inaudible. The audible portions, however, demonstrate what was happening during the transaction. After walking into "Tyson Grocery," Hill said, "Here's two-thirty." Clearly Hill was handing over the $230 worth of food stamps. Shortly thereafter a person whose voice Agent Bennett was able to identify as that of Lawler can be heard saying: "Okay. So that'll be one-ninety." Hill responded, "One-ninety?" Lawler can then be heard counting out the money. Finally, Hill said: "Thanks Billy Jack." To which Lawler replied, "Yeah man." Even with just the tape and transcript the jury would

13

have had no trouble figuring out what happened in that grocery store. Nor would it have any trouble identifying the person Hill dealt with as "Billy Jack," since that is what Hill called him while the transaction was occurring.

Hill's statement thereafter to Agent Bennett was introduced in an attempt to make it that much clearer that it was Lawler who had participated in the taped food stamp transaction. But that statement of Hill's was not very helpful to the prosecution. As Lawler has been quick to point out, Hill was homeless and was paid for helping Agent Bennett. Even the prosecutor warned the jury not to rely solely on the word of Hill, explaining that the testimony of a paid informant must be taken "with a grain of salt." That is why the prosecutor focused more on the audio tape itself during closing arguments and what could be gleaned from it directly, rather than relying on what Hill said afterwards to Bennett. The government introduced persuasive evidence other than Hill's statement to Bennett that Lawler had participated in the taped transaction. Hill's statement was not only cumulative, it was also not particularly persuasive. See Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438 (stating that the importance of the witness' testimony and whether it is cumulative are factors to consider in the harmlessness analysis).

Furthermore, in looking at "the overall strength of the prosecution's case," Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438, the government introduced

14

substantial and persuasive evidence of Lawler's guilt apart from the 1993 transaction. For example, it is undisputed that during the period of time in question, Lawler was named on the "Tyson Grocery" articles of incorporation as the owner, president, treasurer, and secretary. Lawler applied for and was allowed to participate in the USDA food stamp program. The evidence shows that Lawler attended the orientation required to participate in the food stamp program and signed a form acknowledging responsibility for food stamp violations.

During the time period in question, "Tyson Grocery," a small convenience store, was redeeming almost as many food stamps as a full-size Winn-Dixie grocery store located in the same neighborhood. In one month, January 1998, "Tyson Grocery" redeemed more food stamps than that Winn-Dixie store did. Agent Bennett testified that, in her expert opinion, the only way that "Tyson Grocery" could have done that was by illegally trafficking in food stamps. She pointed out that "Tyson Grocery" had a food inventory of only $26,000, while Winn-Dixie had a food inventory of $12,000,000.

Furthermore, Lawler was the sole signatory on the "Tyson Grocery" bank account. He personally deposited the food stamps into that account, and then wrote checks immediately after the deposit withdrawing the cash from the account.

A bank representative testified that such banking practices were very unusual for a business account.

All this evidence strongly supports the inference that Lawler had the criminal intent necessary to be guilty of the charges against him. Based on the foregoing, we hold that if the admission of the confidential informant Hill's statement violated the Confrontation Clause, the error was harmless beyond a reasonable doubt.

B.

Lawler's second and third arguments are that even if there was no violation of the Confrontation Clause, as explicated in Crawford, the district court still erred by admitting Hill's statement because that statement did not meet the requirements of the residual or recorded recollection hearsay exceptions. Again, even if we assume the district court did commit those evidentiary errors, Lawler's convictions are due to be affirmed because any error would have been harmless.

Evidentiary errors are subject to harmless error review. United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005). Non-constitutional errors are subject to a less demanding standard than errors of a constitutional nature. See United States v. Mathenia, 409 F.3d 1289, 1292 (11th Cir. 2005); United States v.

16

Robles, 408 F.3d 1324, 1327 (11th Cir. 2005). Because we found the admission of Hill's statement to be harmless under the more onerous standard applicable to constitutional errors, it follows that the error was also harmless under the easier standard applicable to non-constitutional evidentiary errors.

C.

Lawler's fourth argument is that the district court erred by denying his motion for a new trial based on new evidence that would tend to undermine the reliability of Hill's statement to Agent Bennett. In order to establish that the district court abused its discretion in denying a motion for a new trial based on newly discovered evidence, the defendant must show "the evidence is such that a new trial would probably produce a different result." United States v. Schlei, 122 F.3d 944, 991 (11th Cir. 1997). By holding that the admission of the informant's statement was harmless beyond a reasonable doubt, we have already determined that "it [is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error[.]" Neder, 527 U.S. at 18, 119 S. Ct. at 1838. As a result, Lawler's argument fails on this ground as well.

D.

Lawler next argues that the government constructively amended the indictment through its introduction of evidence relating to the 1993 transaction

17

between him and Hill. He contends that the jury was led to believe that it could convict him on the basis of the 1993 transaction alone. Specifically, according to Lawler, because there was no evidence to support the criminal intent element of the counts in the indictment, the jury must have been under the impression that it could convict him on all forty-five counts in the indictment if they believed he had the requisite intent in the 1993 transaction. We find no merit in this argument.

First, Lawler's defense to the charged offenses—that he did not have the requisite criminal intent—applied with the same force to the 1993 transaction as to the charged offenses. There is no reason to believe that the jury would have found that Lawler had the requisite criminal intent with regard to the 1993 transaction, but not with regard to the charged offenses. Second, and more fundamentally, there is more than enough evidence in the record independent of the 1993 transaction to support a finding that he had the requisite criminal intent. See supra, at 13–16.

## E.

Lawler's final set of arguments attack his sentence. He puts forward three contentions about the calculation of it. "In sentencing guidelines cases, we review for clear error a district court's factual findings and review de novo the district

18

court's application of law to those facts." <u>United States v. Cover</u>, 199 F.3d 1270, 1274 (11th Cir. 2000).

1.

Lawler's first argument is that the district court clearly erred by determining that the loss attributable to him was $4,461,124. He contends that, based on his lack of knowledge of the food stamp fraud operation, he should not be held accountable for that entire figure. Lawler's second assertion is that the district court clearly erred by not granting him a minor role reduction. Both arguments hinge on whether one credits Lawler's assertion that he was duped by Freddy and George. The district court did not buy it, and there are several good reasons supporting the court's finding in that respect: (1) Lawler was the owner, president, treasurer, and secretary of "Tyson Grocery"; (2) he obtained the food stamp license from the USDA and attended the orientation seminar; (3) he opened a bank account for the store and was the only signatory; and (4) he personally deposited approximately three million dollars in food stamps into that bank account and wrote the checks immediately withdrawing the funds, a practice a banker testified was unusual. The district court did not clearly err in either its determination of the loss attributable to Lawler or its denial of a minor role reduction.

19

2.

Lawler's third argument is that the food stamp fraud counts (counts 1–35) and the money laundering counts (counts 36–45) should have been grouped together under the 1997 version of the sentencing guidelines pursuant to U.S.S.G. §3D1.2(c) (1997).[4] Failing to group the food stamp fraud counts with the money

---

[4] On November 1, 2001, the guidelines for money laundering offenses were amended to directly tie the calculation of the money laundering offense level to the offense level for the crime that generated the money that was laundered. See U.S.S.G. Supp., App. C, amend. 634, at 227; U.S.S.C. § 2S1.1(a)(1) (stating that the base offense level is "[t]he offense level for the underlying offense from which the laundered funds were derived" if the defendant committed the underlying offense). In addition to this change, the sentencing commission made clear that "[i]n a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of § 3D1.2 (Groups of Closely-Related Counts)." U.S.S.C. § 2S1.1, cmt. n.6.

The purpose of the amendment was:

to promote proportionality by providing increased penalties for defendants who launder funds derived from more serious underlying criminal conduct, such as drug trafficking, crimes of violence, and fraud offenses that generate relatively high loss amounts, and decreased penalties for defendants who launder funds derived from less serious underlying criminal conduct, such as basic fraud offenses that generate relatively low loss amounts.

U.S.S.G. Supp., App. C, amend. 634, at 227.

Had Lawler been sentenced under a version of the guidelines with this amendment incorporated, his fraud and money laundering convictions might well have been grouped. That prospect, however, does not answer the question of whether his convictions should be grouped under the pre-amendment version of the money laundering guidelines that applies to this case. The 2001 amendment changed more than the grouping rule, it changed entirely the way offense levels are calculated for money laundering crimes. The amendment was not a clarification of how the then-existing guidelines operate; it reworked the entire structure of the money laundering guidelines in order to effectuate the stated purpose of achieving proportionality. Given the differences between the pre- and post-amendment guidelines, the 2001 amendment does little to inform our judgment on the grouping issue before us. Cf. United States v. Descent,

20

laundering counts resulted in a two-point increase in Lawler's final offense level

pursuant to U.S.S.G. § 3D1.4. That is what is at stake with this issue.

The sentencing guidelines have provisions directing that certain types of

offenses be grouped together for the purpose of calculating a single offense level

for that group of offenses. The general purpose of those provisions is to bring

together in a single group those counts that "represent essentially the same type of

wrongful conduct with the same ultimate harm." U.S.S.G. Ch. 3, pt. D, intro. cmt.

In operation, § 3D1.2 gives four circumstances under which offenses are to be

grouped. U.S.S.G. §3D1.2 (1997). Lawler only argues that one of those four

situations is applicable to him, and that is 3D1.2(c).

Section 3D1.2(c), states:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

> (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

---

292 F.3d 703 (11th Cir. 2002) (refusing to retroactively apply the 2001 amendment's grouping commentary to group the defendant's fraud and money laundering counts because the change to the money laundering guidelines was substantive, rather than merely clarifying).

U.S.S.G. § 3D1.2(c) (1997). The purpose of this subsection is to prevent "'double counting' of offense behavior" in situations where "the offenses are closely related." Id. cmt. n.5.

In attempting to show that § 3D1.2(c) is applicable to him, Lawler argues that the food stamp fraud counts embody conduct that was treated as a specific offense characteristic in the guidelines applicable to the money laundering counts. The specific offense characteristic in the money laundering guideline that Lawler refers us to is U.S.S.G. § 2S1.2(b)(1)(B) (1997), which specifies a two-point enhancement "[i]f the defendant knew that the funds were the proceeds of . . . [a] specified unlawful activity." The kind of food stamp fraud involved in this case qualifies as a specified unlawful activity. See 18 U.S.C. § 1956(c)(7)(D). Lawler argues that the § 2S1.2(b)(1)(B) enhancement, which was used to increase his offense level for the money laundering counts, was based on conduct that was embodied in the food stamp fraud count. If Lawler is correct, § 3D1.2(c) would direct that his food stamp fraud counts and money laundering counts be grouped.

In deciding not to group the food stamp fraud counts and the money laundering counts under § 3D1.2(c), the district court considered the two leading out-of-circuit decisions that have dealt with this issue: United States v. Lombardi,

5 F.3d 568 (1st Cir. 1993), and United States v. Bartley, 230 F.3d 667 (4th Cir.

2000).

In Lombardi, the defendant pleaded guilty to four counts of mail fraud and

two counts of money laundering.[5]  5 F.3d at 569.  The First Circuit found that the

defendant's mail fraud offenses were not to be grouped with the money laundering

offenses pursuant to § 3D1.2(c), even though he had received a two-point

enhancement pursuant to § 2S1.2(b)(1)(B).  It reasoned that:

> The "conduct" embodied in the mail fraud counts is the various acts
> constituting the frauds, coupled with the requisite intent to deceive; the
> "specific offense characteristic," in U.S.S.G. § 2S1.2(b)(1)(B), is knowledge
> that the funds being laundered are the proceeds of a mail fraud.  It happens
> that Lombardi's knowledge of the funds' source derives from the fact that he
> committed the frauds, but that does not make the fraudulent acts the same
> thing as knowledge of them.

Id. at 571.  In other words, the First Circuit held that the "knowledge" from the

money laundering specific offense characteristic does not equate to the "conduct"

required under § 3D1.2(c).  It also noted that grouping in this circumstance would

create an anomalous situation in that a person who committed both the fraud and

the money laundering would receive the same offense level as someone who just

---

[5] The mail fraud charges were due to the defendant's securing insurance proceeds by
having another person set fire to his property, and the money laundering charges were based on
bank deposits he made with the insurance proceeds.  Id.

23

laundered the money, but happened to know that the money was from a specified unlawful activity.  Id.

In Bartley, the defendant pleaded guilty to one drug count and one money laundering count.  230 F.3d at 668.  In considering whether § 3D1.2(c) required grouping the two counts, the Fourth Circuit decided not to draw a strict distinction between knowledge and conduct.  Instead, the court looked to the purposes behind § 3D1.2(c)—the prevention of "'double counting' of offense behavior" in situations where "the offenses are closely related," U.S.S.G. § 3D1.2(c) cmt. n.5.  The court found that failing to group would result in "double counting" of the same offense behavior—once in the initial enhancement of a count's offense level and again in the calculation of the final offense level under the grouping rules.  Bartley, 230 F.3d at 671.  The Bartley court found that the offenses were closely related under § 3D1.2(c) because:

> both the indictment and the PSR explicitly refer to the association of the two conspiracies, and the district court found that the money laundering "was to conceal and move the proceeds . . . [and] to get those proceeds to other individuals who were in the consignment or fronting chain of command of the drugs."

Id. (alteration in original).

The Bartley court disagreed with the reasoning in Lombardi on the ground that distinguishing between knowledge and conduct "would promote an approach

24

to the Sentencing Guidelines that would require district courts to unnecessarily 'split hairs' or guess congressional intent in evaluating which specific offense characteristics or other adjustments are covered by subsection (c)." Id. at 671. The Bartley court also noted that drawing this distinction would result in never grouping money laundering offenses with drug offenses, even though the guidelines apparently contemplate that such offenses will be grouped under § 3D1.2(c). Id. (citing United States Sentencing Commission, Most Frequently Asked Questions About the Sentencing Guidelines 21 (7th ed. 1994)).

The district court in this case agreed with the First Circuit's reasoning in Lombardi and determined that Lawler's food stamp fraud counts and money laundering counts should not be grouped under § 3D1.2(c). It decided that "knowledge" as used in § 2S1.2(b)(1)(B) is not equivalent to the "conduct" required by § 3D1.2(c). The court also found that the food stamp fraud and the money laundering were "distinct crimes with different purposes." It was further persuaded not to group under § 3D1.2(c), because grouping in this circumstance would give a person who committed both the money laundering and the fraud the same offense level as a person who committed only the money laundering, but knew the money was proceeds of a fraud.

For the reasons the district court gave, we agree with it that the rationale from <u>Lombardi</u> is more persuasive in this case. Applying the distinction between the "knowledge" from § 2S1.2(b)(1)(B) and the "conduct" required by § 3D1.2(c) would not result in unnecessary hair splitting, as the court in <u>Bartley</u> suggested. <u>See</u>, 230 F.3d at 671. The distinction between the two is unavoidable and comes from the plain difference in the plain language of the two operative guidelines provisions. Because the food stamp fraud counts did not embody conduct that is treated as a specific offense characteristic in the money laundering counts, grouping under § 3D1.2(c) is not warranted. The district court committed no error.

**IV.**

For the foregoing reasons, the judgment of the district court is AFFIRMED as to both appellants.